# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

COUNCIL OF ORGANIZATIONS AND OTHERS FOR EDUCATION ABOUT
PAROCHIAID v STATE OF MICHIGAN

Docket No. 158751. Argued November 10, 2020 (Calendar No. 2). Decided December 28, 2020.

The Council of Organizations and Others for Education About Parochiaid, the American Civil Liberties Union of Michigan, and others brought an action in the Court of Claims against the state of Michigan, the Governor, and others, challenging the constitutionality of MCL 388.1752b and seeking to enjoin defendants from distributing under MCL 388.1752b appropriated funds to reimburse nonpublic schools for actual costs they incurred in complying with a health, safety, or welfare requirement mandated by a law or administrative rule of the state. Plaintiffs asserted that MCL 388.1752b violated Article 4, § 30 and Article 8, § 2, as amended by Proposal C, of the 1963 Michigan Constitution because the statute allocates money from the state's general fund to reimburse actual costs incurred by nonpublic schools. Proposal C relevantly provides that no public monies or property shall be appropriated or paid directly or indirectly to aid or maintain any private, denominational, or other nonpublic, pre-elementary, elementary, or secondary school. Proposal C further provides, in relevant part, that no public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school. The parties stipulated not to disburse any funds under MCL 388.1752b until the Court of Claims resolved the case. Plaintiffs and defendants both moved for summary disposition. In July 2017, the Legislature amended MCL 388.1752b to appropriate additional funds for the 2017–2018 school year. Also in that month, the Court of Claims issued a preliminary injunction against disbursing the appropriated funds. Defendants then sought leave to appeal in the Court of Appeals, and the Court of Appeals denied the application in an unpublished order entered on August 14, 2017 (Docket No. 339545). Defendants sought leave to appeal in the Supreme Court, and the Supreme Court denied leave to appeal. 501 Mich 1015 (2018). In April 2018, the Court of Claims, CYNTHIA D. STEPHENS, J., concluded that plaintiffs had standing to file suit and granted plaintiffs' motion for summary disposition, concluding that MCL 388.1752b violated Const 1963, art 8, § 2 because it authorized the payment of public monies to aid or maintain nonpublic schools and to support the employment of persons at nonpublic schools. The court declared the entire statute unconstitutional and enjoined defendants from distributing any funds under the statute; the court did not address plaintiffs' argument under Const 1963, art 4, § 30. Defendants appealed. Meanwhile, in June 2018, the Legislature again amended MCL 388.1752b to appropriate funds for the 2018–2019 school year. In October 2018, the Court of Appeals, MURPHY, P.J., and LETICA, J. (GLEICHER, J., concurring in part and dissenting in part),

reversed the Court of Claims, holding that plaintiffs possessed standing and that MCL 388.1752b did not violate Const 1963, art 8, § 2 to the extent that a reimbursed mandate satisfies a three-part test. 326 Mich App 124 (2018). The Court of Appeals remanded to the Court of Claims for that court to apply the three-part test and to address plaintiffs' alternative argument that MCL 388.1752b violates Const 1963, art 4, § 30. Judge GLEICHER agreed that plaintiffs possessed standing but disagreed that MCL 388.1752b was constitutional, concluding that MCL 388.1752b violates Const 1963, art 8, § 2 because the public money directly and indirectly assists nonpublic schools in keeping their doors open and meeting their payroll. Plaintiffs sought leave to appeal in the Supreme Court, and the Supreme Court granted leave, directing the parties to address whether MCL 388.1752b violates Const 1963, art 8, § 2. 504 Mich 896 (2019).

The judgment of the Court of Appeals was affirmed by equal division.

Justice MARKMAN, joined by Justices ZAHRA and VIVIANO, writing for affirmance, stated that MCL 388.1752b is in accordance with both the religion clauses of the First Amendment of the United States Constitution and Article 8, § 2, as amended by Proposal C, of the 1963 Michigan Constitution. *Traverse City Sch Dist v Attorney General*, 384 Mich 390 (1971), recognized that a literal interpretation of Proposal C would raise significant questions about whether the provision violates the Free Exercise Clause given its effect on religion; rather, *Traverse City* stated that Proposal C prohibits the purchase, with public funds, of educational services from a nonpublic school. Because *Traverse City* was issued contemporaneously with the ratification of Proposal C, it was entitled to particular deference. *Traverse City* upheld the provision of both shared-time and auxiliary services but engaged in a distinct analysis for each: concerning shared time, *Traverse City* reasoned that it was constitutional to provide shared-time services to nonpublic-school students because the control of the funds, teachers, and subjects remained within the public-school system; concerning auxiliary services, rather than emphasizing the "control" aspect, *Traverse City* instead reasoned that providing auxiliary services to nonpublic-school students was constitutional because such services were general health and welfare measures and only had an incidental relation to the instruction of private-school students. Shared-time services are inherently educational in nature; auxiliary services are not. Consequently, because Proposal C was only understood to prohibit appropriations for nonpublic-school educational services, such health and welfare measures as auxiliary services fell outside the scope of Proposal C. Regarding MCL 388.1752b, there is no language in the statute to suggest that public funds are to be appropriated for nonpublic-school *educational* services; rather, MCL 388.1752b provides that public funds are to be appropriated only for "police power" public services to which all educational institutions and all students are generally entitled. Accordingly, MCL 388.1752b does not violate Const 1963, art 8, § 2, as amended by Proposal C, because it does not appropriate funds for nonpublic-school educational services. Justice MARKMAN therefore would have affirmed the judgment of the Court of Appeals that MCL 388.1752b is constitutional and would have remanded this case to the Court of Claims for further proceedings.

Justice CAVANAGH, joined by Chief Justice McCORMACK and Justice BERNSTEIN, writing for reversal, would have declared that MCL 388.1752b violates Const 1963, art 8, § 2 and that operation of Const 1963, art 8, § 2 to prohibit funding of nonpublic schools through MCL 388.1752b did not raise federal constitutional concerns. *Traverse City* set forth an analysis for considering the effect of Const 1963, art 8, § 2 on different categories of funding. The first step of the analysis is to determine whether the statute at issue violates Const 1963, art 8, § 2 as the

constitutional provision would be commonly understood. If the statute does violate Const 1963, art 8, § 2, the next step is to determine whether the application of Const 1963, art 8, § 2 would conflict with the federal Constitution. If there is no conflict, then the funding is prohibited. However, if application of Const 1963, art 8, § 2 would conflict with the federal Constitution, then the question is whether there is an alternative constitutional construction that also preserves the purpose of Const 1963, art 8, § 2 and is consonant with a common understanding of the language used in Const 1963, art 8, § 2. In this case, MCL 388.1752b violates Const 1963, art 8, § 2 as the constitutional provision would be commonly understood; MCL 388.1752b appropriates general-fund monies for the specific purpose of providing that money directly to nonpublic schools, and only to nonpublic schools, to compensate those schools for costs incurred in adhering to this state's general health, safety, and welfare laws. For a nonpublic school, or any other organization in Michigan, complying with general health, safety, and welfare laws is just a cost of doing business. And to say that paying a portion of a teacher's salary does not support that teacher's employment is a forced construction. The opinion for affirmance departed from the *Traverse City* analysis. *Traverse City* employed the alternative construction to shared-time and auxiliary services only after concluding that the literal application of Const 1963, art 8, § 2 created a conflict with the federal Constitution; therefore, the opinion for affirmance in this case erred by applying an alternative construction of Const 1963, art 8, § 2 without first identifying a federal constitutional problem. Moreover, the opinion for affirmance misapplied the alternative analysis by focusing on the limited discussion in *Traverse City* regarding auxiliary services even though that discussion was explicitly limited to the auxiliary services at issue in that case. Accordingly, Justice CAVANAGH would have reversed the Court of Appeals, declared MCL 388.1752b unconstitutional, and prohibited funding under MCL 388.1752b.

Affirmed by equal division.

Justice CLEMENT did not participate because of her prior involvement as chief legal counsel for Governor Rick Snyder.

©2020 State of Michigan

# OPINION

Chief Justice:
   Bridget M. McCormack

Chief Justice Pro Tem:
   David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED December 28, 2020

S T A T E   O F   M I C H I G A N

SUPREME COURT

COUNCIL OF ORGANIZATIONS AND
OTHERS FOR EDUCATION ABOUT
PAROCHIAID, AMERICAN CIVIL
LIBERTIES UNION OF MICHIGAN,
MICHIGAN PARENTS FOR SCHOOLS,
482FORWARD, MICHIGAN
ASSOCIATION OF SCHOOL BOARDS,
MICHIGAN ASSOCIATION OF SCHOOL
ADMINISTRATORS, MICHIGAN
ASSOCIATION OF INTERMEDIATE
SCHOOL ADMINISTRATORS,
MICHIGAN SCHOOL BUSINESS
OFFICIALS, MICHIGAN ASSOCIATION
OF SECONDARY SCHOOL PRINCIPALS,
MIDDLE CITIES EDUCATION
ASSOCIATION, MICHIGAN
ELEMENTARY AND MIDDLE SCHOOL
PRINCIPALS ASSOCIATION,
KALAMAZOO PUBLIC SCHOOLS, and
KALAMAZOO PUBLIC SCHOOLS
BOARD OF EDUCATION,

        Plaintiffs-Appellants,

v                                                      No. 158751

STATE OF MICHIGAN, GOVERNOR,
DEPARTMENT OF EDUCATION, and
SUPERINTENDENT OF PUBLIC
INSTRUCTION,

       Defendants-Appellees.

---

BEFORE THE ENTIRE BENCH (except CLEMENT, J.)

MARKMAN, J. (*for affirmance*).

    This Court, as the highest court of our state, is obligated to defer to the highest law of our land, the United States Constitution. We are also obligated to defer, if at all possible, to the will of our citizenry, which serves as the foundation of our state Constitution. And we are finally obligated to defer, when this can be done, to the judgment of our Legislature, which directly represents that citizenry and enacts laws on its behalf. This case involves the intersection of each of these three sources of self-government: our federal Constitution, our state Constitution, and our statutory law. We are asked in this dispute to either nullify the will of the citizenry, which has ratified an amendment of our state Constitution, or to nullify the judgment of our Legislature. Respectfully, we decline to take either course. Instead, we conclude that MCL 388.1752b, a law of this state reimbursing nonpublic schools for costs incurred in complying with state health, safety, and welfare mandates, is in accordance with both the religion clauses of the First Amendment of our federal Constitution and Article 8, § 2, as amended by Proposal C in 1970, of our state Constitution. Accordingly, we would affirm the judgment of the Court of Appeals and remand to the Court of Claims for further proceedings consistent with our opinion.

## I. FACTS & HISTORY

In June 2016, Governor Rick Snyder signed into law 2016 PA 249, which was codified at MCL 388.1752b. This statute appropriated $2.5 million in funds for the 2016–2017 school year "to reimburse costs incurred by nonpublic schools" for compliance with various state health, safety, and welfare mandates to be identified by the Department of Education, such as state asbestos regulations and vehicle inspections. In July 2016, the Governor asked this Court for an advisory opinion as to whether MCL 388.1752b violates Const 1963, art 8, § 2, which generally prohibits "aid" to "nonpublic schools," but we declined this request. *In re Request for Advisory Opinion Regarding Constitutionality of 2016 PA 249*, 500 Mich 875 (2016).

In March 2017, plaintiffs sued the state defendants in the Court of Claims, alleging that MCL 388.1752b violates Const 1963, art 8, § 2 and Const 1963, art 4, § 30, which provides that "[t]he assent of two-thirds of the members elected to and serving in each house of the legislature shall be required for the appropriation of public money or property for local or private purposes." The parties promptly stipulated not to disburse any funds under the statute until the Court of Claims resolved the case. In July 2017, the Legislature amended MCL 388.1752b to appropriate additional funds for the 2017–2018 school year. Also in that month, the Court of Claims issued a preliminary injunction against disbursing the appropriated funds. Defendants then sought leave to appeal in the Court of Appeals, and the panel denied the application. *Council of Organizations & Others for Ed About Parochiaid v Michigan*, unpublished order of the Court of Appeals, entered August 14, 2017 (Docket No. 339545). Defendants sought leave to appeal in this Court, and this Court

denied leave to appeal as well. *Council of Organizations & Others for Ed About Parochiaid v Michigan*, 501 Mich 1015 (2018).

In April 2018, the Court of Claims entered a permanent injunction against disbursing the appropriated funds, concluding that MCL 388.1752b violates Const 1963, art 8, § 2, and defendants appealed that decision. Meanwhile, in June 2018, the Legislature again amended MCL 388.1752b, this time to appropriate funds for the 2018–2019 school year. In October 2018, the Court of Appeals-- in a split decision with the opinion of the Court authored by Judge MURPHY and joined by Judge LETICA-- reversed the Court of Claims and remanded to that court for further proceedings. *Council of Organizations & Others for Ed About Parochiaid v Michigan*, 326 Mich App 124; 931 NW2d 65 (2018). The Court of Appeals held that plaintiffs possessed standing under MCL 600.2041(3) and MCR 2.201(B)(4)(a), consistent with *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349; 792 NW2d 686 (2010). *Council of Organizations & Others for Ed About Parochiaid*, 326 Mich App at 138-139. The Court of Appeals further held that MCL 388.1752b does not violate Const 1963, art 8, § 2 to the extent that a reimbursed mandate satisfies the following three-part test:

> [T]he reimbursement may only [constitutionally] occur if the action or performance that must be undertaken to comply with a health, safety, or welfare mandate (1) is, at most, merely *incidental* to teaching and providing educational services to nonpublic school students (noninstructional in nature), (2) does not constitute a *primary* function or element necessary for a nonpublic school to exist, operate, and survive, and (3) does not involve or result in excessive religious entanglement. [*Id*. at 130-131.]

4

The Court of Appeals then remanded to the Court of Claims for that court to apply this test to each reimbursable mandate and to address plaintiffs' alternate argument that MCL 388.1752b violates Const 1963, art 4, § 30. *Id*. at 131.

Judge GLEICHER agreed with the Court of Appeals majority that plaintiffs possessed standing but disagreed that MCL 388.1752b was constitutional. She concluded that MCL 388.1752b violates Const 1963, art 8, § 2 because "[t]he public money directly and indirectly assists nonpublic schools in keeping their doors open and meeting their payroll. It is unconstitutional for that simple reason." *Id*. at 170 (GLEICHER, J., concurring in part and dissenting in part).

Plaintiffs next sought leave to appeal in this Court. We granted leave, directing that the "parties shall include among the issues to be briefed whether MCL 388.1752b violates Const 1963, art 8, § 2." *Council of Organizations & Others for Ed About Parochiaid v Michigan*, 504 Mich 896 (2019).

## II. STANDARD OF REVIEW

"Matters of constitutional and statutory interpretation are reviewed de novo." *People v Skinner*, 502 Mich 89, 99; 917 NW2d 292 (2018). "A statute will be presumed to be constitutional by the courts unless the contrary clearly appears; and in case of doubt every possible presumption not clearly inconsistent with the language and the subject matter is to be made in favor of the constitutionality of legislation." *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939). "Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so

5

clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution, that a court will refuse to sustain its validity." *Id.*

Furthermore, " '[w]hen courts are considering the constitutionality of an act, they should take into consideration the things which the act affirmatively permits, and not what action an administrative officer may or may not take.' " *Rassner v Fed Collateral Soc, Inc*, 299 Mich 206, 217-218; 300 NW 45 (1941), quoting *Northern Cedar Co v French*, 131 Wash 394, 412; 230 P 837 (1924). Thus, "[a] valid statute is not rendered unconstitutional on the basis of improper administration." *Council of Organizations & Others for Ed About Parochiaid v Governor*, 455 Mich 557, 570-571; 566 NW2d 208 (1997). "Similarly, an invalid statute is not redeemed by compensating actions on the part of its administrators." *Id.* at 571.

## III. BACKGROUND

After our Constitution was adopted in 1963, Article 8, § 2 provided as follows:

> The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.

In *Advisory Opinion re Constitutionality of 1970 PA 100*, 384 Mich 82, 89-90; 180 NW2d 265 (1970), this Court addressed the constitutionality of a statute enacted by the Legislature earlier that year, 1970 PA 100, providing "for the purchase by the Department of Education from eligible units of educational services in secular subjects at a cost of not to exceed 50 per cent of the salaries of lay teachers teaching secular subjects for the fiscal years 1970–

6

71 and 1971–72 and 75 per cent of such salaries thereafter."[1]  Relevant to the instant dispute, the law provided for the appropriation of public funds to nonpublic schools to pay a portion of the salaries of teachers who taught secular subjects.  See *id*.  We held that 1970 PA 100 did not violate the Establishment Clause of the First Amendment of the United States Constitution because it satisfied the requirement set forth in *Sch Dist of Abington Twp v Schempp*, 374 US 203, 222; 83 S Ct 1560; 10 L Ed 2d 844 (1963), that " 'to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.' "[2]  *Id*. at 95, quoting *Sch Dist of Abington Twp*, 374 US at 222.  The Court also held that 1970 PA 100 did not violate Const 1963, art 1, § 4,[3] explaining that " 'incidental benefits' to religious

---

[1] "Eligible unit" was defined, in part, by 1970 PA 100 as "a board of education, association or corporation operating a nonpublic school or system of nonpublic schools," *id*. at 89 n 2, while "secular subjects" was defined, in part, as "those courses of instruction commonly taught in the public schools of this state," *id*. at 90 n 3.  1970 PA 100 prohibited payment for educational services to any teacher who was "a member of a religious order . . . or who wears any distinctive habit, or both."

[2] The Establishment Clause provides as follows: "Congress shall make no law respecting an establishment of religion . . . ."  US Const, Am I.  It is applicable to the states as well as the federal government.  See *Everson v Ewing Twp Bd of Ed*, 330 US 1, 8; 67 S Ct 504; 91 L Ed 711 (1947).

[3] Const 1963, art 1, § 4 provides as follows:

> Every person shall be at liberty to worship God according to the dictates of his own conscience.  No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion.  No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose.  The civil and political rights, privileges

7

sects or societies do not invalidate an otherwise constitutional statutory program plainly intended and formulated to serve a public purpose." *Advisory Opinion re Constitutionality of 1970 PA 100*, 384 Mich at 104. Rather, "[t]o adopt a strict 'no benefits, primary or incidental' rule would render religious places of worship and schools completely ineligible for all State services." *Id*. "To accept the arguments of the opponents of [1970 PA 100] would sanction open hostility to sectarian institutions. This violates the posture of neutrality incumbent upon the State in its relation to sectarian institutions." *Id*. at 105.

Meanwhile, in response to 1970 PA 100, commonly known as "Parochiaid,"[4] a citizen group named "Council Against Parochiaid" circulated petitions and obtained sufficient signatures to place a proposed "anti-parochiaid" constitutional amendment, Proposal C, on the ballot for the November 1970 election. See *Traverse City Sch Dist v Attorney General*, 384 Mich 390, 406 n 2; 185 NW2d 9 (1971). That amendment was ratified, adding the following language to Const 1963, art 8, § 2:

> Nonpublic schools, prohibited aid.
>
> No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or

---

> and capacities of no person shall be diminished or enlarged on account of his religious belief.

[4] We are cognizant that many view this term as pejorative. We use it here not to express our approbation, but simply because it constituted a commonplace description of 1970 PA 100 and was a term widely employed in the course of the surrounding public discussion and debate.

the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students. The legislature may provide for the transportation of students to and from any school.

This Court was soon thereafter called upon to interpret Proposal C in *Traverse City*. In that case, this Court considered several issues, two of which are relevant here. First, the Court considered whether Proposal C precluded the provision of "shared time" instruction, which it described as " 'an arrangement for pupils enrolled in nonpublic elementary or secondary schools to attend public schools for instruction in certain subjects,' " to nonpublic-school students. *Traverse City*, 384 Mich at 411 n 3, quoting Staff of Senate Committee on Labor and Public Welfare, 88th Cong (1st Sess), *Proposed Federal Promotion of "Shared Time" Education* (Comm Print, 1963), p 1. We observed that "[s]hared time has been an accepted fact of American life for more than forty years. . . . On the basis of historical analysis, therefore, it would require a strong showing that Proposal C really did intend to outlaw shared time in the public schools because that had become a long accepted practice over a number of years." *Traverse City*, 384 Mich at 411 n 3. The Court then held that Proposal C did not preclude the provision of "shared time," at least on public-school property, reasoning as follows:

> Shared time differs from parochiaid in three significant respects. First, under parochiaid the public funds are paid to a private agency whereas under shared time they are paid to a public agency. Second, parochiaid permitted the private school to choose and to control a lay teacher where as under shared time the public school district chooses and controls the teacher. Thirdly, parochiaid permitted the private school to choose the subjects to be taught, so long as they are secular, whereas shared time means the public school system prescribes the public school subjects. These differences in control are legally significant.

\* \* \*

9

It should be needless to observe special circumstances not considered above may create unconstitutional religious entanglements, but shared time in and of itself does not. [*Id*. at 413-414, 417.]

Second, the Court considered whether Proposal C precluded the provision of "auxiliary services"-- which it alternatively described as "special educational services designed to remedy physical and mental deficiencies of school children and provide for their physical health and safety" or "general health and safety measures"-- to nonpublic-school students. *Id*. at 418-419.[5]  We concluded that Proposal C did not preclude the provision of such "auxiliary services," asserting:

> The prohibitions of Proposal C have no impact upon auxiliary services.  Since auxiliary services are general health and welfare measures, they have only an incidental relation to the instruction of private school children.  They are related to educational instruction only in that by design and purpose they seek to provide for the physical health and safety of school children, or they treat physical and mental deficiencies of school children so that such children can learn like their normal peers.  Consequently, the prohibitions of Proposal C which are keyed into prohibiting the passage of public funds into private school hands for purposes of running the private school operation are not applicable to auxiliary services which only incidentally involve the operation of educating private school children.

> In addition auxiliary services are similar to shared time instruction in that private schools exercise no control over them.  They are performed by public employees under the exclusive direction of public authorities and are given to private school children by statutory direction, not by an administrative order from a private school.

> * * *

> We do not read the prohibition against public expenditures to support the employment of persons at nonpublic schools to include policemen,

---

[5] At the time *Traverse City* was decided, such "auxiliary services" included "health and nursing services and examinations" and "teacher counsellor services for physically handicapped children," among other services.  *Id*. at 417-418, quoting MCL 340.622, as enacted by 1955 PA 269, repealed by 1976 PA 451.

firemen, nurses, counsellors and other persons engaged in governmental, health and general welfare activities. Such an interpretation would place nonpublic schools outside of the sovereign jurisdiction of the State of Michigan.

Since the employment stricture is a part of the educational article of the constitution, we construe it to mean employment for educational purposes only. [*Id*. at 419-421.]

Furthermore, we observed that denying nonpublic-school students "shared time" or "auxiliary services," when these were otherwise offered to public-school students, might be viewed as imposing an affirmative burden upon the free exercise of religion as protected by the Free Exercise Clause of the First Amendment of the United States Constitution:[6]

When a private school student is denied participation in publicly funded shared time courses or auxiliary services offered at the public school because of his status as a nonpublic school student and he attends a private school out of religious conviction, he also has a burden imposed upon his right to freely exercise his religion. The constitutionally protected right of the free exercise of religion is violated when a legal classification has a coercive effect upon the practice of religion without being justified by a compelling state interest. *Engel v Vitale*, 370 US 421; 82 S Ct 1261; 8 L Ed 2d 601 (1962); *Sherbert v Verner*, 374 US 398; 83 S Ct 1790; 10 L Ed 2d 965 (1963) . . . .

In passing, it may be noted that the Attorney General in his brief argued that *Sherbert* is inapplicable. He pointed out "Proposal C does not deal with religious schools as such but rather with all private schools whether sectarian or nonsectarian." However, the Supreme Court of the United States in matters of racial discrimination looks to the "impact" of the classification. *Hunter v Erickson*, 393 US 385; 89 S Ct 557; 21 L Ed 2d 616 (1969). This same principle should apply to the First Amendment's protection against religious discrimination and here with ninety-eight percent of the private

---

[6] "The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, . . . provides that 'Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof* . . . .' " *Church of the Lukumi Babalu Aye, Inc v Hialeah*, 508 US 520, 531; 113 S Ct 2217; 124 L Ed 2d 472 (1993) (emphasis in *Lukumi*).

school students being in church-related schools the "impact" is nearly total. [*Id.* at 433-434 (citation omitted).]

Finally, the Court summarized the following pertinent conclusions:

> 1. Proposal C above all else prohibits state funding of purchased educational services in the nonpublic school where the hiring and control is in the hands of the nonpublic school, otherwise known as "parochiaid."
>
> 2. Proposal C has no prohibitory impact upon shared time instruction wherever offered provided that the ultimate and immediate control of the subject matter, the personnel and the premises are under the public school system authorities and the courses are open to all eligible to attend the public school, or absent such public school standards, when the shared time instruction is merely "incidental" or "casual" or non-instructional in character, subject, of course, to the issue of religious entanglement.
>
> 3. Proposal C does not prohibit auxiliary services and drivers training, which are general health and safety services, wherever these services are offered except in those unlikely circumstances of religious entanglement. [*Id.* at 435 (citations omitted).]

Four years later, in *In re Advisory Opinion re Constitutionality of 1974 PA 242*, 394 Mich 41; 228 NW2d 772 (1975), this Court considered the constitutionality of 1974 PA 242, a statute that required school districts to "purchase and loan or provide textbooks and supplies to all children of school age residing in such district . . . ." We concluded that the statute violated Proposal C to the extent that it required the provision of textbooks and supplies to nonpublic-school students, asserting:[7]

> In my opinion the Court reached correct conclusions in the *Traverse City School District* case because the services examined therein were properly classified as "incidental" to a private school's establishment and existence. . . . Such programs as shared time and auxiliary services to be sure, do help a private school compete in today's harsh economic climate;

---

[7] *In re Advisory Opinion* was authored by Justice SWAINSON. Although it is styled as a partial concurrence and dissent and authored in the first person, it was signed by a majority of the justices and therefore is tantamount to a majority opinion.

12

but, they are not "primary" elements necessary for the school's survival as an educational institution. These incidental services are useful only to an otherwise viable school and are not the type of services that flout the intent of the electorate expressed through Proposal C.

A very different situation is presented, I find, in the case of the textbooks and supplies that would be made available to private schools under [1974 PA 242]. When we speak of textbooks and supplies we are no longer describing commodities "incidental" to a school's maintenance and support. Textbooks and supplies are essential aids that constitute a "primary" feature of the educational process and a 'primary' element required for any school to exist. [*Id*. at 48-49.]

It is against this backdrop that the Legislature in 2016 enacted the law in present controversy, MCL 388.1752b.[8] MCL 388.1752b provides, in relevant part:

(1) From the general fund money appropriated under [MCL 388.1611], there is allocated an amount not to exceed $2,500,000.00 for 2017-2018 and an amount not to exceed $250,000.00 for 2018-2019 to reimburse actual costs incurred by nonpublic schools in complying with a health, safety, or welfare requirement mandated by a law or administrative rule of this state.

(2) By January 1 of each applicable fiscal year, the department shall publish a form for reporting actual costs incurred by a nonpublic school in complying with a health, safety, or welfare requirement mandated under state law containing each health, safety, or welfare requirement mandated by a law or administrative rule of this state applicable to a nonpublic school and with a reference to each relevant provision of law or administrative rule for the requirement. . . .

(3) By June 30 of each applicable fiscal year, a nonpublic school seeking reimbursement for actual costs incurred in complying with a health, safety, or welfare requirement under a law or administrative rule of this state

---

[8] As noted previously, MCL 388.1752b was amended in 2017, see 2017 PA 108, and in 2018, see 2018 PA 265. In addition, the Legislature passed an amendment of MCL 388.1752b in 2020, see 2020 PA 165, but that amendment was the subject of a line-item veto by the Governor. Although we now address the constitutionality of the present version of MCL 388.1752b, our analysis applies with equal force to the previous versions of the statute.

13

during each applicable school year shall submit a completed form described in subsection (2) to the department. . . .

(4) By August 15 of each applicable fiscal year, the department shall distribute funds to each nonpublic school that submits a completed form described under subsection (2) in a timely manner. . . .

\* \* \*

(7) The funds appropriated under this section are for purposes related to education, are considered to be incidental to the operation of a nonpublic school, are noninstructional in character, and are intended for the public purpose of ensuring the health, safety, and welfare of the children in nonpublic schools and to reimburse nonpublic schools for costs described in this section.

(8) Funds allocated under this section are not intended to aid or maintain any nonpublic school, support the attendance of any student at a nonpublic school, employ any person at a nonpublic school, support the attendance of any student at any location where instruction is offered to a nonpublic school student, or support the employment of any person at any location where instruction is offered to a nonpublic school student.

\* \* \*

(10) For the purposes of this section, the actual cost incurred by a nonpublic school for taking daily student attendance shall be considered an actual cost in complying with a health, safety, or welfare requirement under a law or administrative rule of this state. Training fees, inspection fees, and criminal background check fees are considered actual costs in complying with a health, safety, or welfare requirement under a law or administrative rule of this state.[9]

---

[9] MCL 388.1752b thus specifies only "taking daily student attendance," as well as "[t]raining fees, inspection fees, and criminal background check fees," as reimbursable state health, safety, and welfare mandates. MCL 388.1752b(10). All other reimbursable mandates are to be identified by the Department of Education under MCL 388.1752b(2). In accordance with MCL 388.1752b(2), the Department of Education's "Section 152b Reimbursement Form" has identified about 35 to 40 reimbursable mandates since the statute was enacted, such as MCL 324.8316 (requiring notice to parents of pesticide application by the school), MCL 333.17609 (licensure of school speech pathologists), and MCL 408.681 *et seq.* (the Playground Equipment Safety Act). Michigan Department of Education, *Section 152b Reimbursement Form*

## IV. ANALYSIS

The central issue here concerns the proper interpretation of Const 1963, art 8, § 2, as amended by Proposal C.[10]  "The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification."  *Wayne Co v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004). Proposal C relevantly provides that "[n]o public monies or property shall be appropriated or paid . . . directly or indirectly to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school."  It further provides that "[n]o . . . public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school . . . ."

Read literally, the state would be prohibited from providing any public benefits to nonpublic schools because doing so would at least presumably "indirectly" aid the

---

<https://www.michigan.gov/documents/mde/Copy_of_2019_Section_152b_Reimbursement _Form_655754_7.xlsx> (accessed December 9, 2020) [Google generated HTML view preserved at https://perma.cc/F9CW-MP77].

[10] The issue of standing was litigated in the lower court.  The Court of Appeals held that plaintiffs possess standing under MCL 600.2041(3), which provides, in pertinent part, that "an action to prevent the illegal expenditure of state funds or to test the constitutionality of a statute relating thereto may be brought in the name of a domestic nonprofit corporation organized for civic, protective, or improvement purposes," and MCR 2.201(B)(4)(a), which similarly provides that "[a]n action to prevent illegal expenditure of state funds or to test the constitutionality of a statute relating to such an expenditure may be brought . . . in the name of a domestic nonprofit corporation organized for civic, protective, or improvement purposes[.]"  Because our grant order did not direct the parties to address whether plaintiffs possess standing, we decline to address that issue today.

nonpublic school.[11]  Providing police and fire services to a nonpublic school, for instance, "indirectly" aids that school because the school does not need to provide for its own police or fire protection and, as a result, has available additional funds for other educational purposes.  And when that nonpublic school is religious in character and attended by students for that reason, denying the services of the police and fire departments to the nonpublic school-- indeed, denying such services *alone* to such institutions-- would seemingly raise concerns under the Free Exercise Clause.  The only educational institutions that would be deprived of these and other fundamental public services-- provided *exclusively* and *monopolistically* by the government-- would be nonpublic schools.  See *Sherbert*, 374 US at 410 ("[N]o State may 'exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation.' "), quoting *Everson v Ewing Twp Bd of Ed*, 330 US 1, 16; 67 S Ct 504; 91 L Ed 711 (1947).[12]  See also *Wisconsin v Yoder*, 406 US 205, 214; 92 S Ct 1526; 32 L

---

[11] Judicial interpretive processes grounded in "originalist," "textualist," or "interpretivist" premises are often caricatured as requiring "literal" readings of the law.  More properly understood, such approaches to reading the law commonly require that the most "reasonable" meaning of the law be identified by discerning the intentions of the lawmakers using the ordinary meaning of the language they employed.

[12] We acknowledge the arguments of such amici as Immaculate Heart of Mary that Proposal C violates the Free Exercise Clause notwithstanding its interpretation by *Traverse City* and that MCL 388.1752b should be sustained as constitutional for that reason alone. Because no party has advanced that argument, see *Council of Organizations & Others for Ed About Parochiaid v Michigan*, 321 Mich App 456; 909 NW2d 449 (2017) (holding that entities such as Immaculate Heart of Mary did not possess a right to intervene as parties in this case), we decline to address it today.  We note, however, that Free Exercise caselaw from the United States Supreme Court has developed significantly since Proposal C was enacted in 1970 (notably, *Traverse City* was decided shortly thereafter) and that these

Ed 2d 15 (1972) ("[A] State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce*, 'prepare (them) for additional obligations.' "), quoting *Pierce v Society of Sisters*, 268 US 510, 535; 45 S Ct 571; 69 L Ed 1070 (1925). Thus, as *Traverse City* correctly recognized, a literal interpretation of Proposal C would raise significant questions about whether the provision violates the Free Exercise Clause given its effect on religion. See *Traverse City*, 384 Mich at 430, 433-434.[13] Ultimately, we do not believe that this literal interpretation would give reasonable

developments may conceivably warrant consideration in a future case addressing the constitutionality of that amendment. See, e.g., *Trinity Lutheran Church of Columbia, Inc v Comer*, 582 US___; 137 S Ct 2012; 198 L Ed 2d 551 (2017); *Espinoza v Montana Dep't of Revenue*, 591 US ___; 140 S Ct 2246; 207 L Ed 2d 679 (2020). See also *Roman Catholic Diocese of Brooklyn v Cuomo*, 592 US ___, ___; ___ S Ct ___; ___ L Ed 2d ___ (2020) (Docket No. 20A87) (Kavanaugh, J., concurring); slip op at 2 ("[I]t does not suffice for a State to point out that, as compared to houses of worship, *some* secular businesses are subject to similarly severe or even more severe restrictions.").

[13] In this regard, although Proposal C is facially neutral with respect to religion, the United States Supreme Court has indicated that "the effect of a law in its real operation" and its "adverse impact" on religion are relevant considerations in assessing its constitutionality. *Lukumi*, 508 US at 535. About 98% of nonpublic schools in Michigan were religious when Proposal C was enacted, *Traverse City*, 384 Mich at 434, and according to the amicus brief of the Michigan Catholic Conference, about 90% of nonpublic schools in Michigan are religious today. There are also questions regarding the significance of any antireligious sentiments motivating the adoption of Proposal C. Compare *Lukumi*, 508 US at 540-541 (noting that the historical background of the challenged enactment, including "contemporaneous statements made by members of the decisionmaking body," were relevant), with *id*. at 558 (Scalia, J., concurring in part and concurring in the judgment) (declining to use these materials because "[t]he First Amendment does not refer to the purposes for which legislators enact laws, but to the effects of the laws enacted"); see also

17

understanding to the intentions of the ratifiers of the constitutional amendment, and in this view we are in accord with *Traverse City*.

*Traverse City* did not interpret Proposal C in such a literal manner in which even the most fundamental services of the state-- the most universally recognized of its "police powers" in providing for the "health, safety, and welfare" of the public-- would be denied *only* to nonpublic schools, their students, and the parents of those students. Rather, recognizing that Proposal C was ratified in immediate response to concerns of "Parochiaid"-- a statute that provided public funds to nonpublic schools specifically to facilitate the teaching of secular subjects-- and recognizing that a "literal" interpretation of Proposal C would give rise to serious concerns under the Free Exercise Clause as interpreted by such United States Supreme Court decisions as *Sherbert*, *Traverse City* stated that "read in the light of the circumstances leading up to and surrounding its adoption, and the common understanding of the words used, [Proposal C] prohibits the purchase, with public funds, of educational services from a nonpublic school." *Traverse City*, 384 Mich at 406-407.

---

*Reitman v Mulkey*, 387 US 369, 373; 87 S Ct 1627; 18 L Ed 2d 830 (1967) (assessing whether a state constitutional provision violated the federal Constitution on the basis of "its 'immediate objective' [and] its 'ultimate effect' ") (punctuation omitted). For example, Proposal C was drafted by an entity named "Council Against Parochiaid," and the term "Parochiaid" undoubtedly referred to public funding for religious schools. See *Webster's New World Dictionary of the American Language* (1974) (defining "parochial" as "of or in a parish or parishes" and "parochial school" as "a school supported and controlled by a church"). Such facts might suggest that Proposal C was intended to target religious schools. Ultimately, in light of the parties' failure to raise the First Amendment arguments and also *Traverse City*'s saving interpretation, we need not determine now whether these considerations regarding antireligious sentiments render Proposal C indistinguishable from the state constitutional provisions at issue in *Trinity Lutheran* and *Espinoza*.

The parties agree that the principles set forth in *Traverse City* interpreting Proposal C are critical in this case, and no party asks us to overrule this decision. The importance of *Traverse City* is amplified because it was issued contemporaneously with the ratification of Proposal C; *Traverse City* is thus entitled to particular deference for that reason alone. See *McPherson v Blacker*, 92 Mich 377, 383; 52 NW 469 (1892) (" '[W]here a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that [a] strong presumption exists that the construction rightly interprets the intention.' "), quoting Cooley, Constitutional Limitations (5th ed), p 67. We therefore turn to an examination of its fundamental principles.

*Traverse City*, while upholding the provision of both shared-time and auxiliary services, nonetheless engaged in distinct analyses for each. Concerning shared time, *Traverse City* reasoned that it was constitutional to provide shared-time services to nonpublic-school students because the "control" of the funds, teachers, and subjects remained within the public-school system. *Traverse City*, 384 Mich at 413-414. The Court concluded that "Proposal C has no prohibitory impact upon shared time instruction wherever offered provided that the ultimate and immediate control of the subject matter, the personnel and the premises are under the public school system authorities . . . ." *Id*. at 435.

However, the *Traverse City* analysis regarding the provision of auxiliary services was considerably different. Rather than emphasizing the "control" aspect, *Traverse City* instead reasoned that providing auxiliary services to nonpublic-school students was constitutional because such services are "general health and welfare measures, [and] they

19

have only an incidental relation to the instruction of private school children." *Id.* at 419. The Court concluded that "Proposal C does not prohibit auxiliary services and drivers training, which are general health and safety services, wherever these services are offered except in those unlikely circumstances of religious entanglement." *Id.* at 435. Noticeably absent from its conclusion was any reference to "control." See *id.*

The reason for this analytical distinction is clear. Once again, as *Traverse City* explained, Proposal C, "read in the light of the circumstances leading up to and surrounding its adoption, and the common understanding of the words used, prohibits the purchase, with public funds, of educational services from a nonpublic school." *Id.* at 406-407. See also *id.* at 435 ("Proposal C above all else prohibits state funding of purchased educational services in the nonpublic school where the hiring and control is in the hands of the nonpublic school, otherwise known as 'parochiaid.' "). Consistently with this understanding that Proposal C only prohibits appropriations for nonpublic-school educational services, *In re Advisory Opinion* subsequently explained that "services" that are " 'incidental' to a private school's establishment and existence" are constitutional, whereas "aids that constitute a 'primary' feature of the educational process and a 'primary' element required for any school to exist" are unconstitutional. *In re Advisory Opinion*, 394 Mich at 48-49. Shared-time services are inherently educational in nature; auxiliary services are not. Appropriating public funds to educate nonpublic-school students implicates the core of Proposal C. It is for this reason, in our judgment, that *Traverse City* was careful to explain that shared-time services were constitutional only because, in all material respects, the "control" remained within the public-school system. But auxiliary services, as "general health and welfare measures," *Traverse City*, 384 Mich at 419, are not educational in

20

nature. "They are related to educational instruction only in that by design and purpose they seek to provide for the physical health and safety of school children, or they treat physical and mental deficiencies of school children so that such children can learn like their normal peers." *Id*. Consequently, because Proposal C was only understood to prohibit appropriations for nonpublic-school educational services, such health and welfare measures as auxiliary services simply fell outside the scope of Proposal C.[14]

With this in mind, we turn to MCL 388.1752b. This statute appropriates public funds to nonpublic schools "to reimburse actual costs incurred by nonpublic schools in complying with a health, safety, or welfare requirement mandated by a law or

---

[14] The opinion for reversal reads *Traverse City* as having adopted in its construction of Proposal C a "literal" standard of interpretation pertaining to provisions that would *not* conflict with the federal Constitution and a varying "alternative" standard of interpretation pertaining to provisions that *would* conflict with the federal Constitution: "[*Traverse City*] recognized that a modification of the operation of Const 1963, art 8, § 2 is necessary *where there is a conflict with the federal Constitution*. But because there was no conflict with the federal Constitution in applying Const 1963, art 8, § 2 to 1970 PA 100, we applied Const 1963, art 8, § 2 without the alternative construction." We respectfully disagree that *Traverse City* adopted such an irregular approach to giving meaning to Proposal C. Rather, our decision in that case adopted a consistent standard of interpretation, one that "prohibit[ed] the purchase, with public funds, of educational services from a nonpublic school," *Traverse City*, 384 Mich at 407, and then applied that same standard throughout the case to other issues. Indeed, adopting variable standards of interpretation of a constitutional provision depending on the substantive issues involved would be contrary to traditional principles of constitutional interpretation: "A cardinal rule in dealing with written instruments is that they are to receive an unvarying [and consistent standard of] interpretation, and that their practical construction is to be uniform. A constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable." Cooley, Constitutional Limitations (8th ed), pp 123-124. Thus, we respectfully disagree with the opinion for reversal that *Traverse City* engaged in an exercise of variable interpretation *and* that as a result this Court should now engage in a similar exercise in the instant case. That is, we believe that this opinion, as with *Traverse City*, accords a consistent and reasonable (not a "literal") meaning to Proposal C.

21

administrative rule of this state." MCL 388.1752b(1). It seems self-evident that any "health, safety, or welfare" mandate, including any of those specifically listed in MCL 388.1752b(10), exists to provide for the health, safety, or welfare of such individuals *as* nonpublic-school students, and we struggle to conceive of *any* "health, safety, or welfare" mandate concerning nonpublic schools that is *not* genuinely and in good faith incidental to the instruction of nonpublic-school children. Or as the Court of Appeals majority explained, "[a] state-law mandate on an issue concerning the *health, safety, or welfare* of a student almost by definition is 'incidental' to teaching and providing educational services to a student." *Council of Organizations & Others for Ed About Parochiaid*, 326 Mich App at 152. Reimbursements for compliance with such governmental mandates are permissible under *Traverse City*, which stated that public funds may constitutionally be appropriated to "provide for [nonpublic-school students'] physical health and safety," so long as such appropriations "only incidentally involve the operation of educating private school children" and do not create an "excessive entanglement between church and state." *Traverse City*, 384 Mich at 418-420.[15] There is no language in MCL 388.1752b(1) to suggest that public funds are to be appropriated for nonpublic-school *educational* services; rather, MCL 388.1752b(1) provides that public funds are to be appropriated only for "police power" public services to which all educational institutions and all students are generally entitled. See *Bankers' Trust Co of Detroit v Russell*, 263 Mich 677, 684; 249 NW 27 (1933) ("[T]he police power . . . is an exercise of the sovereign right of the

---

[15] See also *Walz v Tax Comm of New York City*, 397 US 664, 674; 90 S Ct 1409; 25 L Ed 2d 697 (1970) ("We must also be sure that the end result—the effect—is not an excessive government entanglement with religion. The test is inescapably one of degree.").

government to protect the lives, health, morals, comfort, and general welfare of the people . . . ."). Nor is there language in the remaining subsections of MCL 388.1752b to suggest that public funds are appropriated for nonpublic-school *educational* services.[16] Rather, MCL 388.1752b(2), (3), (4), (7), (9), (10), (11), and (12) explicitly refer to reimbursements for complying with a state "health, safety, or welfare" mandate, thus removing all doubt as to the nature of the appropriated funds.[17] Because it does not violate Proposal C to appropriate public funds to "provide for [nonpublic-school students'] physical health and safety," *Traverse City*, 384 Mich at 419, and because MCL 388.1752b appropriates funds only to provide for nonpublic-school students' "health, safety, and welfare," MCL 388.1752b is clearly constitutional.[18]

---

[16] We acknowledge that MCL 388.1752b(7) provides that the appropriated funds "are for purposes related to education . . . ." In our judgment, however, this language does not contemplate that the appropriated funds are for nonpublic-school educational services-- given that the funds are clearly not being expended for that purpose-- but only that such funds are being provided in the obvious context of the nonpublic-school process, i.e., that the funds are "connected with" or "related to" the nonpublic-school educational process, as opposed, for example, to being "connected with" or "related to" 1,001 other types of private and public institutions or processes. See also note 20 of this opinion.

[17] Indeed, because nonpublic schools are merely being *reimbursed* for compliance with state-imposed mandates, such reimbursements, as balanced against the mandates themselves, do not render the schools in a better position than they would have been in the absence of both the reimbursements and the mandates. That is, the reimbursements, at least arguably, do not "aid" the nonpublic schools for the purposes of Proposal C because they merely mitigate the effect of burdens imposed in the first place by the state for the health, safety, and welfare of nonpublic-school students.

[18] The Court of Claims on remand must ascertain whether any of the reimbursable mandates identified by the Department of Education would improperly provide funds to nonpublic schools for educational services. However, even if some of the mandates do improperly provide funds to nonpublic schools for educational services, this would not alter our conclusion that MCL 388.1752b is itself constitutional. See *Council of Organizations &*

Moreover, the two "purpose clauses" of MCL 388.1752b, Subsections (7) and (8), reinforce the constitutionality of the statute.[19]  Subsection (7) provides that the appropriated funds "are for purposes related to education, are considered to be incidental to the operation of a nonpublic school, are noninstructional in character, and are intended for the public purpose of ensuring the health, safety, and welfare of the children in nonpublic schools . . . ."  This subsection is consistent with *Traverse City*, which allowed for the appropriation of public funds for auxiliary services that bear "only an incidental relation to the instruction of private school children" and "by design and purpose . . . seek to provide for the physical health and safety of school children . . . ."  *Traverse City*, 384 Mich at 419.[20]  Subsection (8) provides that the appropriated funds "are not intended to aid or maintain any nonpublic school, support the attendance of any student at a nonpublic school, employ any person at a nonpublic school, support the attendance of any student at any

*Others for Ed About Parochiaid*, 455 Mich at 570-571 ("A valid statute is not rendered unconstitutional on the basis of improper administration.").

[19] When considering the constitutionality of a statute, courts can consider "both statements of fact and declarations of policy which indicate that the legislature considered the proposed legislation and, cognizant of the issue, determined that the statute was reasonable."  1A Singer & Singer, Sutherland Statutes and Statutory Construction (7th ed, November 2020 update), § 20:4.

[20] Subsection (7) states that the appropriated funds "are for purposes related to education," and *Traverse City* explained that Proposal C prohibits the appropriation of funds for the "educational instruction" of nonpublic-school students.  See *Traverse City*, 384 Mich at 419.  We find this statutory language to be irrelevant for purposes of our analysis, however.  *Traverse City* recognized that "auxiliary services" that concern health, safety and welfare "incidentally involve the operation of educating private school children."  *Id*. at 419-420.  So too here.  State health, safety, and welfare mandates applicable to nonpublic schools incidentally involve the operation of educating nonpublic-school students and may fairly be characterized as "related to education" without running afoul of Proposal C.

24

location where instruction is offered to a nonpublic school student, or support the employment of any person at any location where instruction is offered to a nonpublic school student." This language tracks the prohibitions set forth in Proposal C itself and clearly demonstrates the intention of the Legislature to avoid a conflict with Proposal C.[21]

We recognize that *Traverse City* concerned the provision of health, safety, and welfare "services," whereas the instant case concerns the provision of public funds directly to nonpublic schools for compliance with state health, safety, and welfare mandates. However, we discern no principled difference in this regard because the auxiliary services permitted by *Traverse City* are substantively indistinguishable from the reimbursements permitted by MCL 388.1752b. In both cases, public funds are appropriated to provide for the health, safety, and welfare of nonpublic-school students. And there is significant logical overlap between permissible auxiliary services and the specific reimbursements presumptively authorized by MCL 388.1752b. For instance, one auxiliary service permitted in *Traverse City* was "speech correction services." See *Traverse City*, 384 Mich at 418, quoting MCL 340.622, as enacted by 1955 PA 269, repealed by 1976 PA 451. And the Department of Education under MCL 388.1752b allows reimbursement for licensure

---

[21] Of course, it is invariably "presumed that the Legislature intended to enact a constitutional law, and not an unconstitutional law; and it should be construed in accordance with this intent." *Clarence Twp v Dickenson*, 151 Mich 270, 272; 115 NW 57 (1908) (citation omitted). That presumption is particularly warranted here because MCL 388.1752b expressly evidences the Legislature's intention to enact a constitutional law. See *Redevelopment Comm of Greensboro v Security Nat'l Bank of Greensboro*, 252 NC 595, 611; 114 SE2d 688 (1960) ("Although the legislative findings and declaration of policy have no magical quality to make valid that which is invalid, and are subject to judicial review, they are [nonetheless] entitled to weight in construing the statute and in determining whether the statute promotes a public purpose or use under the Constitution.").

of a school speech pathologist.  See MCL 333.17609.  If the state is constitutionally permitted to provide speech-correction services directly to nonpublic-school students without running afoul of Proposal C, it seems also, in our judgment, that the state should be able to facilitate those same services indirectly in the manner set forth by MCL 388.1752b.

Plaintiffs argue that MCL 388.1752b breaches the Constitution in three principal respects, none of which we find persuasive.  First, plaintiffs argue that MCL 388.1752b breaches the Constitution because it "specifically provides for direct payments to nonpublic schools to assist them in complying with state mandates."  However, to the extent that plaintiffs contend that *Traverse City* creates a bright-line rule against any direct payments to nonpublic schools whatsoever, we respectfully disagree.  Such a rule is not found within *Traverse City* itself, nor can such a rule be reasonably or logically implied when that decision is viewed as a whole.  As we have explained, *Traverse City* concerns the appropriation of public funds for nonpublic schools to provide *educational services*.  To the extent that plaintiffs argue that any public aid in complying with state mandates is unconstitutional because compliance with "mandates" is a necessary element of a nonpublic school's existence, see *In re Advisory Opinion*, 394 Mich at 49 (explaining that aiding " 'primary' elements necessary for the [nonpublic] school's survival as an educational institution" is unconstitutional under Proposal C), we also respectfully disagree and believe that this would require overruling *Traverse City*.  The shared-time services upheld in *Traverse City* certainly aided the nonpublic schools in complying with their statutory mandate to teach secular subjects such as mathematics-- when a nonpublic-school student receives advanced mathematics instruction at a public school under such a program,

26

the nonpublic school is, at the very least, assisted in teaching mathematics to that student.[22]

See MCL 388.551 of the private, denominational, and parochial schools act, MCL 388.551 *et seq*. ("It is the intent of this act that the sanitary conditions of the schools subject to this act, the courses of study in those schools, and the qualifications of the teachers in those schools shall be of the same standard as provided by the general school laws of this state.").[23]  Thus, if we accepted plaintiffs' argument that public funds cannot be appropriated to aid nonpublic schools in complying with state mandates, we would be compelled to overrule *Traverse City* concerning its maintenance of shared-time programs, which even plaintiffs themselves have not sought from this Court.

Second, plaintiffs argue that MCL 388.1752b breaches the Constitution because it "support[s] the employment of persons at nonpublic schools," contrary to Proposal C, which prohibits state funds "to support . . . the employment of any person at any such nonpublic school."  This argument, however, has already been foreclosed by *Traverse City*, in which the Court stated that "[s]ince the employment stricture is a part of the educational article of the constitution, we construe it to mean employment for educational purposes

---

[22] In *Snyder v Charlotte Pub Sch Dist*, 421 Mich 517, 540; 365 NW2d 151 (1984), this Court explained that "the types of courses that have traditionally been offered on a shared time basis" include "band, art, domestic science, shop, [and] advanced math and science classes" because such courses "need not be taught in nonpublic schools."  Presumably, when a nonpublic-school student receives advanced mathematics instruction at a public school, he or she need not also receive mathematics instruction at his or her nonpublic school.  And as a result, "shared time . . . [also] incidentally defray[s] the cost of educational expenses incurred by parents and enables nonpublic schools to continue or upgrade their present curriculum . . . ."  *Id*. at 544 n 15.

[23] The statute used substantially the same language at the time we decided *Traverse City*. 1970 CL 388.551.

only." *Traverse City*, 384 Mich at 421. That is, because Article 8 of our Constitution is exclusively limited to educational matters, Proposal C, when read in context, prohibits the use of public funds for employment as to educational matters. To the extent that MCL 388.1752b indirectly reimburses nonpublic-school employees for complying with state health, safety, and welfare mandates, those funds are necessarily not being used for employment regarding educational matters.

Third, plaintiffs argue that MCL 388.1752b breaches the Constitution because "it provides funds directly to nonpublic schools, thus removing the 'control' that the Court found to be so important in [*Traverse City*]." As we have explained, however, *Traverse City* emphasized the "control" aspect only with regard to shared-time services, which genuinely are educational in nature. Concerning auxiliary services, the Court emphasized that such services "are general health and welfare measures, [and] they have only an incidental relation to the instruction of private school children." *Traverse City*, 384 Mich at 419. We therefore disagree with plaintiffs that the extent to which the public funds appropriated by MCL 388.1752b are placed within the "control" of nonpublic schools is pertinent for purposes of our analysis.

## V. CONCLUSION

We conclude that MCL 388.1752b does not violate Const 1963, art 8, § 2, as amended by Proposal C, because it does not appropriate funds for nonpublic-school educational services. Rather, MCL 388.1752b only exercises the "police powers" of the state on behalf of the "health, safety, and welfare" of nonpublic-school students, which is not proscribed by our Constitution. Therefore, we would affirm the judgment of the Court

28

of Appeals that MCL 388.1752b is constitutional and remand this case to the Court of Claims for further proceedings consistent with our opinion. On remand, the Court of Claims shall address whether the Department of Education has improperly administered the statute by purporting to reimburse nonpublic schools for educational services, contrary to Proposal C.

Stephen J. Markman
Brian K. Zahra
David F. Viviano

S T A T E   O F   M I C H I G A N

SUPREME COURT

COUNCIL OF ORGANIZATIONS AND
OTHERS FOR EDUCATION ABOUT
PAROCHIAID, AMERICAN CIVIL
LIBERTIES UNION OF MICHIGAN,
MICHIGAN PARENTS FOR SCHOOLS,
482FORWARD, MICHIGAN
ASSOCIATION OF SCHOOL BOARDS,
MICHIGAN ASSOCIATION OF SCHOOL
ADMINISTRATORS, MICHIGAN
ASSOCIATION OF INTERMEDIATE
SCHOOL ADMINISTRATORS,
MICHIGAN SCHOOL BUSINESS
OFFICIALS, MICHIGAN ASSOCIATION
OF SECONDARY SCHOOL PRINCIPALS,
MIDDLE CITIES EDUCATION
ASSOCIATION, MICHIGAN
ELEMENTARY AND MIDDLE SCHOOL
PRINCIPALS ASSOCIATION,
KALAMAZOO PUBLIC SCHOOLS, and
KALAMAZOO PUBLIC SCHOOLS
BOARD OF EDUCATION,

        Plaintiffs-Appellants,

v                                                                No. 158751

STATE OF MICHIGAN, GOVERNOR,
DEPARTMENT OF EDUCATION, and
SUPERINTENDENT OF PUBLIC
INSTRUCTION,

        Defendants-Appellees.

CAVANAGH, J. (*for reversal*).

This appeal requires us to determine whether MCL 388.1752b, which allocates public funds to nonpublic schools, violates Const 1963, art 8, § 2. To do so, we are also required to determine whether operation of Const 1963, art 8, § 2 in this context would conflict with the federal Constitution. Because MCL 388.1752b clearly violates Const 1963, art 8, § 2, and because operation of Const 1963, art 8, § 2 to prohibit funding of nonpublic schools through MCL 388.1752b does not raise federal constitutional concerns, we would reverse the Court of Appeals, declare MCL 388.1752b unconstitutional, and prohibit funding under the statute.

## I. FACTS AND PROCEDURAL HISTORY

In 2016, MCL 388.1752b was enacted pursuant to 2016 PA 249. The statute allocated general funds to nonpublic schools through direct payments. For the 2016–2017 school year, the statute allocated up to $2.5 million. The statute was later amended, allocating additional funds for the school years 2017–2018 and 2018–2019. See 2017 PA 108; 2018 PA 265. In July 2016, this Court was asked to opine on whether MCL 388.1752b violates Const 1963, art 8, § 2, but we declined to do so. *In re Request for Advisory Opinion Regarding Constitutionality of 2016 PA 249*, 500 Mich 875 (2016).

In this case, plaintiffs filed their complaint in the Court of Claims in 2017, challenging the constitutionality of MCL 388.1752b under Const 1963, art 8, § 2 and Const 1963, art 4, § 30. The Court of Claims granted summary disposition to plaintiffs under MCR 2.116(C)(10), finding MCL 388.1752b to be in violation of Const 1963, art 8, § 2. The Court of Claims enjoined defendants from distributing funds under the statute and held that it was unnecessary to reach plaintiffs' arguments regarding Const 1963, art 4, § 30.

2

Defendants appealed as of right, and the Court of Appeals reversed the Court of Claims in a split decision. *Council of Organizations & Others for Ed About Parochiaid v Michigan*, 326 Mich App 124; 931 NW2d 65 (2018). The Court of Appeals majority employed a three-part test and remanded the case to the Court of Claims to apply the test against individual reimbursable costs and to address plaintiffs' argument regarding Const 1963, art 4, § 30. *Id*. at 147, 157. Plaintiffs sought leave to appeal here, and we granted leave, directing the parties to address whether MCL 388.1752b violates Const 1963, art 8, § 2. *Council of Organizations & Others for Ed About Parochiaid v Michigan*, 504 Mich 896 (2019).

## II. STANDARD OF REVIEW

This Court reviews de novo both questions of statutory interpretation and constitutional law. *People v Vanderpool*, 505 Mich 391, 397; ___ NW2d ___ (2020).

## III. ANALYSIS

When construing the Michigan Constitution, this Court employs the rule of "common understanding":

> A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, The intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, But rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed. [*Traverse City Sch Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley, Constitutional Limitations (6th ed), p 81, and *May v Topping*, 65 W Va 656, 660; 64 SE 848 (1909) (quotation marks omitted).]

3

The object of constitutional interpretation is to "ascertain and give effect to the intent of the people in adopting it." *Kearney v Bd of State Auditors*, 189 Mich 666, 671; 155 NW 510 (1915). In this endeavor, we may consider both "the circumstances surrounding the adoption of a constitutional provision" as well as "the purpose sought to be accomplished." *Traverse City*, 384 Mich at 405.

## A. LEGAL BACKGROUND

In 1970, the Legislature allocated funds to pay a portion of the salaries of lay teachers instructing secular subjects at nonpublic schools. 1970 PA 100. In *Advisory Opinion re Constitutionality of 1970 PA 100*, 384 Mich 82; 180 NW2d 265 (1970), this Court was asked to address whether this allocation of funds violated the Establishment Clause of the First Amendment of the United States Constitution or the analogous provision in Michigan's Constitution, Const 1963, art 1, § 4. We held that 1970 PA 100 violated neither.

In reaching this conclusion, we analogized Const 1963, art 1, § 4 to the First Amendment of the United States Constitution. The First Amendment, we noted, contains two parts: the Establishment Clause, "Congress shall make no law respecting an establishment of religion," and the Free Exercise Clause, "or prohibiting the free exercise thereof[.]" In the Michigan Constitution, Const 1963, art 1, § 4 provides:

> Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. The civil and political rights, privileges

4

and capacities of no person shall be diminished or enlarged on account of his religious belief.

We read this as "an expanded and more explicit statement" of the federal analogue, with "the first and fourth sentences constituting the Free Exercise Clause, and the second and third sentences constituting the Establishment Clause." *Advisory Opinion*, 384 Mich at 105. Accordingly, we held that they are subject to similar interpretation. *Id*. Given this legal foundation, we observed that "[t]o adopt a strict 'no benefits, primary or incidental' rule would render religious places of worship and schools completely ineligible for all State services" and concluded that such a rule would violate "the posture of neutrality incumbent upon the State in its relation to sectarian institutions." *Id*. at 104. We added that "no part or portion of this opinion may be taken or construed" as resolving "any possible question" regarding a future constitutional amendment. *Id*. at 105.

1970 PA 100 proved controversial, and its opponents organized an initiative to amend Michigan's Constitution to prohibit public funding of nonpublic schools. The issue went on the ballot as Proposal C, and voters approved an amendment in November 1970, adding the following language to Const 1963, art 8, § 2:

> No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students. The legislature may provide for the transportation of students to and from any school.

5

Soon after the passage of this amendment, in *Traverse City*, this Court was asked to decide whether 1970 PA 100 conflicted with Const 1963, art 8, § 2. *Traverse City*, 384 Mich at 403. The procedural posture of that case is worth noting.

Prior to the voters weighing in on Proposal C, the Attorney General was asked to offer an advisory opinion "concerning [the] proper interpretation" of the proposed amendment. 1 OAG, 1970, No. 4,715, p 183, at 183 (November 3, 1970). The Attorney General first addressed the effect of Proposal C on 1970 PA 100, opining that "[i]t is clear that the language of the first sentence of the proposed amendment would prohibit such expenditures of public funds and the effect of adoption of this amendment would be to make this section of [1970 PA 100] unconstitutional." *Id*. at 185. The Attorney General went on to opine that transportation allocations would be constitutional, given the amendment's specific exception for the provision of transportation. Regarding shared-time programs,[1] the Attorney General noted that the amendment barred payment to support the attendance of any student or employment of any person "at 'any location or institution where instruction is offered in whole or *in part* to nonpublic school students' " and therefore shared-time programs would be prohibited. *Id*. at 186. Regarding auxiliary services[2] being offered to nonpublic-school students, the Attorney General opined that the

---

[1] A shared-time program, as we discussed in *Traverse City*, is a program in which a public school makes some part of its curriculum available to students outside its school. *Traverse City*, 384 Mich at 411 n 3.

[2] Auxiliary services, as discussed in *Traverse City*, were "limited to those services enumerated in the Auxiliary Services Act." *Traverse City*, 384 Mich at 420. In "practical application," examples of auxiliary services received by nonpublic-school students included hearing tests, vision tests, physical examinations, availability of crossing guards, remedial reading services, and speech correction. *Id*. at 418 & n 4.

6

amendment would bar these, too, given that "the language of the proposed amendment is phrased in broad terms which provide for the furnishing of transportation to and from any school as its only specific exception." *Id*. at 185.

The Traverse City School District brought a declaratory-judgment suit to test the validity of the Attorney General's opinion. *Traverse City*, 384 Mich at 403. This Court ordered the circuit court to certify seven questions. *Id*. at 403-404. With regard to 1970 PA 100, our discussion was brief. We observed that as amended, Const 1963, art 8, § 2 prohibited the use of public funds " 'directly or indirectly to aid or maintain' a nonpublic school." *Id*. at 406, quoting Const 1963, art 8, § 2. Given the common understanding of those words, the funding of teachers' salaries at nonpublic schools was unconstitutional. *Id*. at 406-407. In that regard, we agreed with the Attorney General and held that no future payments could be made pursuant to 1970 PA 100.

Regarding shared-time and auxiliary-services programs, we differed with the Attorney General. We reasoned that the Attorney General's application of Const 1963, art 8, § 2 would have violated the Free Exercise Clause of the First Amendment of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *Id*. at 429-435. We reasoned that excluding nonpublic-school students from services otherwise available to the public required justification under strict scrutiny. *Id*. at 431. We emphasized that "[t]his does not mean that a public school district must offer shared time instruction or auxiliary services; it means that if it does offer them to public school children at the public school, nonpublic school students also have a right to receive them at the public school." *Id*. at 433. Further, we noted that "[n]onpublic school students are not unconstitutionally discriminated against if shared time instruction

7

is available at public schools but not at nonpublic schools so long as they have access to shared time instruction at the public school." *Id*. at 434.

To reconcile Const 1963, art 8, § 2 with these federal constitutional concerns, we struck the language " 'or at any location or institution where instruction is offered in whole or in part to such nonpublic school students.' " *Id*. at 415. We applied an "alternative constitutional construction" of Const 1963, art 8, § 2 to shared-time and auxiliary services and held that those were permissible. *Id*. at 412, 436.

We next considered Const 1963, art 8, § 2 in *In re Advisory Opinion re Constitutionality of 1974 PA 242*, 394 Mich 41; 228 NW2d 772 (1975). There, we considered a program in which the State Board of Education would have purchased textbooks and supplies to loan or provide free of charge to children in public schools and nonpublic schools alike. We reaffirmed *Traverse City*, noting that shared-time and auxiliary-services programs might help a nonpublic school, but they were not "primary" elements necessary for the school's survival as an educational institution and were "not the type of services that flout the intent of the electorate expressed through Proposal C." *Id*. at 49. Textbooks, however, we held were a "primary" feature of the educational process, and therefore we held that providing funding for textbooks to nonpublic schools was barred by Const 1963, art 8, § 2. *Id*. at 50.

## B.  LEGISLATION AT ISSUE

At issue now is MCL 388.1752b, enacted in 2016 and amended in 2017 and 2018. The statute allocated up to $2.5 million for 2017–2018 and $250,000 for 2018–2019 to "reimburse actual costs incurred by nonpublic schools in complying with a health, safety,

8

or welfare requirement mandated by a law or administrative rule of this state." MCL 388.1752b(1). The scheme required the Department of Education to publish a form for nonpublic schools to report costs for reimbursement. MCL 388.1752b(2). Nonpublic schools were free to seek reimbursement or not, and the superintendent of public instruction was to distribute the allocated funds among applicants on a prorated or other equitable basis. MCL 388.1752b(2) to (5).

Regarding what constitutes an "actual cost," the statute specifies that the term includes "the hourly wage for the employee or employees performing a task or tasks required to comply with a health, safety, or welfare requirement under a law or administrative rule of this state . . . ." MCL 388.1752b(9). Further, reimbursable "actual costs" include "the actual cost incurred by a nonpublic school for taking daily student attendance" as well as "[t]raining fees, inspection fees, and criminal background check fees . . . ." MCL 388.1752b(10).

The statute also includes two provisions regarding the Legislature's intent in allocating the funds:

> (7) The funds appropriated under this section are for purposes related to education, are considered to be incidental to the operation of a nonpublic school, are noninstructional in character, and are intended for the public purpose of ensuring the health, safety, and welfare of the children in nonpublic schools and to reimburse nonpublic schools for costs described in this section.

> (8) Funds allocated under this section are not intended to aid or maintain any nonpublic school, support the attendance of any student at a nonpublic school, employ any person at a nonpublic school, support the attendance of any student at any location where instruction is offered to a nonpublic school student, or support the employment of any person at any location where instruction is offered to a nonpublic school student.

C.  THE *TRAVERSE CITY* OPINION

Our task here is similar to our task in *Traverse City*, in which we considered the effect of Const 1963, art 8, § 2 on three categories of funding—1970 PA 100, shared-time services, and auxiliary services.  Because our analysis here should operate as it did there, it is worth explicitly noting some of the implicit steps in the *Traverse City* analysis.  The first step is to determine whether the statute at issue violates Const 1963, art 8, § 2 as the constitutional provision would be commonly understood.  If the statute does violate Const 1963, art 8, § 2, the next step is to determine whether the application of Const 1963, art 8, § 2 would conflict with the federal Constitution.  If there is no conflict, then the funding is prohibited.  However, if application of Const 1963, art 8, § 2 would conflict with the federal Constitution, then we decide "whether there is an alternative constitutional construction . . . which also preserves the purpose of [Const 1963, art 8, § 2] . . . and, of course, is consonant with a common understanding of the language used in [Const 1963, art 8, § 2]." *Traverse City*, 384 Mich at 412-413.  Our analysis from *Traverse City* tracks these steps with regard to 1970 PA 100, shared-time services, and auxiliary services.

In *Traverse City*, with regard to 1970 PA 100, our analysis was brief.  We noted that the funding proposed under 1970 PA 100 violated Const 1963, art 8, § 2.  We concluded that the funding was invalid without discussing whether the federal Constitution was implicated or applying any sort of alternative construction:

> In *Advisory Opinion re Constitutionality of PA 1970, No 100*, 384 Mich 82, 180 NW2d 265 (1970), we held that the Constitution of Michigan did not prohibit the purchase with public funds of secular educational services from a nonpublic school.
>
> Article 8, Sec. 2, as amended by Proposal C, now prohibits the use of public funds "directly or indirectly to aid or maintain" a nonpublic school.

> The language of this amendment, read in the light of the circumstances leading up to and surrounding its adoption, and the common understanding of the words used, prohibits the purchase, with public funds, of educational services from a nonpublic school.
>
> Accordingly, we hold Chapter 2, Act 100, P.A. 1970, unconstitutional as of December 19, 1970, the effective date of the amendment, and any credits accumulated on or after that date are invalid. [*Traverse City*, 384 Mich at 406-408.]

The necessary implication in our reasoning was that there was no federal constitutional problem, and therefore no alternate construction was needed.

With regard to shared-time programs, we first noted that the Attorney General had concluded that the newly amended Const 1963, art 8, § 2 prohibited funding of shared-time programs. *Traverse City*, 384 Mich at 412. Without commenting on whether that conclusion was correct as a textual matter, we reasoned that the conclusion would violate both the Free Exercise Clause and the Equal Protection Clause of the United States Constitution. *Id*. Therefore, we proceeded to ask whether there was "an alternative constitutional construction." *Id*. In doing so, we drew direct comparisons between shared-time services provided at public schools and payments under 1970 PA 100 to nonpublic schools that had already been struck down. We found important differences:

> First, under [1970 PA 100] the public funds are paid to a private agency whereas under shared time they are paid to a public agency. Second, [1970 PA 100] permitted the private school to choose and to control a lay teacher where as [sic] under shared time the public school district chooses and controls the teacher. Thirdly, [1970 PA 100] permitted the private school to choose the subjects to be taught, so long as they are secular, whereas shared time means the public school system prescribes the public school subjects. [*Id*. at 413-414.]

We characterized these distinctions as "differences in control." *Id*. at 414. In opining whether a shared-time program could theoretically be located at a nonpublic school, we

specified that "the ultimate and immediate control of the subject matter, the personnel and premises must be under the public school system authorities, and the courses open to all eligible to attend a public school." *Id*. at 415. We made clear that our analysis hinged on control, describing the discussion as "our 'control' construction of the amendment and the purposes . . . for which it was adopted." *Id*. at 416.

Similarly, we found no violation of Const 1963, art 8, § 2 with regard to auxiliary services given that "auxiliary services are similar to shared time instruction in that private schools exercise no control over them. They are performed by public employees under the exclusive direction of public authorities and are given to private school children by statutory direction, not by an administrative order from a private school." *Id*. at 420. We applied the same "alternative constitutional construction" or "control construction" we applied to shared-time services. Though we did not explicitly note the analytical predicates to application of the alternative construction, there, too, the Attorney General had concluded that as amended, Const 1963, art 8, § 2 prohibited funding of auxiliary services for nonpublic-school students. 1 OAG, 1970, No. 4,715, at 185. Accordingly, for auxiliary services, the analysis was the same as with 1970 PA 100 and shared-time programs. Further, we specifically limited future applicability of our discussion of auxiliary services:

> Of course, what this Court holds regarding auxiliary services is limited to those services enumerated in the Auxiliary Services Act. The clause in the Act which states that auxiliary services shall include "such other services as may be determined by the legislature" does not give the legislature a blank check to make any service a health and safety measure outside the reach of Proposal C simply by calling it an auxiliary service. [*Traverse City*, 384 Mich at 420.]

## D. MCL 388.1752b VIOLATES THE COMMON UNDERSTANDING OF CONST 1963, ART 8, § 2

As in *Traverse City*, our first step in this case is to determine whether MCL 388.1752b violates Const 1963, art 8, § 2 as the constitutional provision would be commonly understood. We conclude that it does.

MCL 388.1752b appropriates general-fund monies for the specific purpose of providing that money directly to nonpublic schools, and only to nonpublic schools, to compensate those schools for costs incurred in adhering to this state's general health, safety, and welfare laws. For a nonpublic school, or any other organization in Michigan, complying with general health, safety, and welfare laws is just a cost of doing business. The dissenting judge in the Court of Appeals was correct that MCL 388.1752b is merely paying the overhead of the nonpublic school:

> The voters understood that providing money for a private school's overhead is exactly the same thing as directly allocating aid and maintenance payments. It does not matter whether the overhead payments are intended to cover "education" or any of the myriad costs that a business must bear. [*Council of Organizations & Others for Ed About Parochiaid v Michigan*, 326 Mich App 124, 166; 931 NW2d 65 (2018) (GLEICHER, J., concurring in part and dissenting in part).]

Article 8, § 2 is explicit that "[n]o public monies or property shall be appropriated or paid . . . directly or indirectly to aid or maintain any . . . nonpublic, pre-elementary, elementary, or secondary school." Whatever else "aid or maintain" may include, it surely includes direct payments to offset a nonpublic school's overhead.

Further, the payments MCL 388.1752b calls for effectively function as payroll payments because the law reimburses nonpublic schools for the labor costs (based on the hours worked and the wage rate) of employing a person to "perform[] a task or tasks

13

required to comply with a health, safety, or welfare requirement under a law or administrative rule of this state . . . ."  MCL 388.1752b(9) (defining "actual costs").  In this way, the law not only violates the prohibition in Const 1963, art 8, § 2 on aid or maintenance to nonpublic schools; the law also allows for reimbursements that violate the constitutional directive that "[n]o payment . . . shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school . . . ."  Applying the rule of common understanding to this language, we cannot see how paying any portion of the salaries of teachers at nonpublic schools does not "directly or indirectly . . . aid or maintain any . . . nonpublic, pre-elementary, elementary, or secondary school" or "directly or indirectly . . . support . . . the employment of any person at any such nonpublic school . . . ."  In interpreting our Constitution, "we must presume that *words have been employed in their natural and ordinary meaning. . . .*  This is but saying that no forced or unnatural construction is to be put upon their language[.]"  Cooley, Constitutional Limitations (6th ed), p 73.  To say that paying a portion of a teacher's salary does not support that teacher's employment is a "forced" construction, to say the least.  This is sufficient to conclude that MCL 388.1752b violates Const 1963, art 8, § 2.

E.  OUR DECISION IN *TRAVERSE CITY* DOES NOT REQUIRE A DIFFERENT RESULT

The opinion for affirmance apparently agrees with this much, acknowledging that "[r]ead literally, the state would be prohibited from providing any public benefits to nonpublic schools because doing so would at least presumably 'indirectly' aid the nonpublic school."  But the opinion for affirmance then departs from this Court's method

14

of analysis in *Traverse City*. It is clear that this legislation does *not* raise the same sort of overbreadth concerns that we discussed with regard to shared-time and auxiliary services in *Traverse City*, and we needn't search for a forced reading of Const 1963, art 8, § 2 to avoid the result that is dictated by a common understanding of the constitutional language.

In *Traverse City*, as explained earlier, we *did* apply Const 1963, art 8, § 2 literally to prospectively invalidate any funding 1970 PA 100 would have provided to pay teachers' salaries at nonpublic schools. We employed the alternative construction to shared-time and auxiliary-services programs only after concluding that the literal application of Const 1963, art 8, § 2 created a conflict with the federal Constitution. The opinion for affirmance glosses over the first and most straightforward holding of *Traverse City*, noting that applying Const 1963, art 8, § 2 to prohibit providing police and fire services to nonpublic schools would "seemingly raise concerns under the Free Exercise Clause." This observation is not novel. We noted several times in *Traverse City* that the possible effect of applying Const 1963, art 8, § 2 to prohibit police and fire services had been a flash point in the public debate over Proposal C. *Traverse City*, 384 Mich at 406 n 2, 435 n 22. As discussed earlier, we recognized that a modification of the operation of Const 1963, art 8, § 2 is necessary *when there is a conflict with the federal Constitution*. But because there was no conflict with the federal Constitution in applying Const 1963, art 8, § 2 to 1970 PA 100, we applied Const 1963, art 8, § 2 without the alternative construction. The opinion for affirmance errs by applying an alternative construction of Const 1963, art 8, § 2 without first identifying a federal constitutional problem.

As we agree with the opinion for affirmance that MCL 388.1752b violates Const 1963, art 8, § 2, the next step is to determine whether the application of Const 1963, art 8,

15

§ 2 would conflict with the federal Constitution. The parties agree that there is no federal constitutional concern, although amici have argued that there is. The opinion for affirmance notes that there has been activity with regard to federal Free Exercise Clause jurisprudence since *Traverse City*. That is true, but recent jurisprudence reinforces the conclusion that there was no conflict between Const 1963, art 8, § 2 and the Free Exercise Clause as applied to 1970 PA 100, and there is no conflict between Const 1963, art 8, § 2 and the Free Exercise Clause as applied to MCL 388.1752b.

In its most recent decision on the subject, *Espinoza v Montana Dep't of Revenue*, 591 US ___, ___; 140 S Ct 2246, 2255; 207 L Ed 2d 679 (2020), the United States Supreme Court reviewed its precedents and stated that those precedents had been distilled "into the unremarkable conclusion that disqualifying otherwise eligible recipients from a public benefit *solely because of their religious character* imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." (Quotation marks and citations omitted; emphasis added.) As *Espinoza* explained: "*A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious.*" *Id*. at ___; 140 S Ct at 2261 (emphasis added). *Espinoza* and its predecessors are not implicated here because Const 1963, art 8, § 2 does not disqualify schools "solely because of their religious character" or indeed take account of their religious character at all. All nonpublic schools are prohibited from receiving public funding under Const 1963, art 8, § 2.

In fact, not even amici argue that Const 1963, art 8, § 2 fails the test of *Espinoza* as discriminating solely on the basis of a school's religious character. Rather, amici take two different tracks. First, they argue that Const 1963, art 8, § 2 violates the Free Exercise

16

Clause because it disproportionately impacts religious schools. However, that argument is clearly foreclosed by *Zelman v Simmons-Harris*, 536 US 639, 658; 122 S Ct 2460; 153 L Ed 2d 604 (2002), in which the Court stated that "[t]he constitutionality of a neutral educational aid program simply does not turn on whether and why, in a particular area, at a particular time, most private schools are run by religious organizations, or most recipients choose to use the aid at a religious school." It is true that *Zelman* dealt with an Establishment Clause challenge rather than a Free Exercise Clause challenge. But amici have not offered any reason why the principle of *Zelman* would not apply in this context, and maybe for good reason. Would the constitutionality of MCL 388.1752b be subject to annual review depending on the percentage of applicants with religious affiliation? Or would the annual determination depend on the amounts requested by applicants rather than the number of applicants? We agree with the *Zelman* Court that this rule would be exceedingly cumbersome to enforce, and we would decline amici's invitation to break new ground here.

Second, amici argue that even if the language of Const 1963, art 8, § 2 does not discriminate based on religious character, it has discriminatory intent, relying on *Church of the Lukumi Babalu Aye, Inc v Hialeah*, 508 US 520; 113 S Ct 2217; 124 L Ed 2d 472 (1993). In *Lukumi*, a group of Santeria practitioners sought to more openly practice their faith in their community, including the practice of ritual animal sacrifice; in response, the local city council convened an "emergency public session" beginning a flurry of resolutions and ordinances. *Id*. at 526. Though the eventual ordinances the Court considered did not explicitly target the Santeria practitioners, one early resolution expressed " 'concern' " that " 'certain religions may propose to engage in practices which

17

are inconsistent with public morals, peace or safety.' " *Id*. Further, the resolution expressed a commitment on behalf of the city to " 'a prohibition against any and all acts of any and all religious groups which are inconsistent with public morals, peace or safety.' " *Id*. Those and other facts were developed in a nine-day bench trial, at the conclusion of which the district court held that the purpose of the ordinance was to end the practice of animal sacrifice, for whatever reason practiced. *Id*. at 528-529. The *Lukumi* Court disagreed with that finding and held that although the ordinance was *facially* neutral, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral . . . ." *Id*. at 533. The Court leaned heavily on the record from the nine-day bench trial in reviewing the lower court's finding on intent, stating that "[n]o one suggests, and on this record it cannot be maintained, that city officials had in mind a religion other than Santeria." *Id*. at 535.

In contrast to *Lukumi*, in this case, there is no lower-court finding regarding intent for this Court to review. In fact, there is no record on this issue at all, and the parties do not even argue that they should be able to establish one. Amici would invite us to make findings of fact based on citations from the events of the amendment of Const 1963, art 8, § 2, which occurred 50 years ago.[3] This invitation evinces a misunderstanding of this Court's function, and therefore we would decline the invitation. Barring such an extraordinary effort, *Lukumi* has no relevance with regard to Const 1963, art 8, § 2.

_____

[3] In addition, how should we decide *whose* intent is relevant? Is it the intent of the proponents of the ballot proposal? The voters? And even assuming that some proponents and some voters may have been motivated by antireligious bigotry, can we fairly conclude that *all* or even *a majority* of voters shared that motivation when they cast their ballots in November 1970? We simply have no basis to reach such a conclusion.

18

Agreeing with the opinion for affirmance that MCL 388.1752b violates Const 1963, art 8, § 2, and having found no conflict with the federal Constitution, resolution of this case is simple. Just as we applied Const 1963, art 8, § 2 without using an alternative construction to invalidate funding through 1970 PA 100, we should apply it here to invalidate funding through MCL 388.1752b.

F. THE OPINION FOR AFFIRMANCE MISAPPLIES *TRAVERSE CITY*

Although we disagree that the "alternative construction" or "control construction" of Const 1963, art 8, § 2 should be applied in this case, because the opinion for affirmance engages in the alternative analysis, we do as well. However, we come to the opposite conclusion: application of such a construction would still invalidate funding through MCL 388.1752b.

Simply stated, the aid provided to nonpublic schools by MCL 388.1752b is of a "direct" nature. The legislation appropriates public monies for one specific purpose: to pay that money directly to nonpublic schools. None of this Court's precedents permits such a result. To the contrary, we stated in *Traverse City* that Const 1963, art 8, § 2, as amended by Proposal C, "above all else prohibits" another form of direct payment—the use of public funds to purchase educational services in a nonpublic school. *Traverse City*, 384 Mich at 435. Now, five decades later, the opinion for affirmance reasons that public monies *can* be paid directly to a nonpublic school to aid or maintain it. The justices that signed the majority opinion in *Traverse City* would be surprised at that result. In fact, one of the crucial distinctions that the Court drew between 1970 PA 100 and "shared time" was the recipient of the funds. *Id*. at 413 ("[U]nder [1970 PA 100] the public funds are paid to

19

a private agency whereas under shared time they are paid to a public agency."). And with respect to "auxiliary services," we stated that "the prohibitions of Proposal C *which are keyed into prohibiting the passage of public funds into private school hands for purposes of running the private school operation* are not applicable to auxiliary services . . . ." *Id.* at 419-420 (emphasis added).

As discussed earlier, in *Traverse City* we employed an alternative construction to Const 1963, art 8, § 2 with regard to shared-time and auxiliary services. Necessarily, our discussion of each category focused on the particularities of those programs. But the dissenting judge in the Court of Appeals correctly identified the common thread joining them:

> [T]he Supreme Court took great pains to draw a constitutional line between services provided to nonpublic schools funded by public dollars—forbidden under Proposal C—and those offered to nonpublic school students but funded entirely through payments to *public* schools; the latter could continue because the money stayed in the public fisc and was not "paid to a private agency." [*Council of Organizations & Others for Ed About Parochiaid*, 326 Mich App at 163 (GLEICHER, J., concurring in part and dissenting in part).]

When employing the alternative construction of Const 1963, art 8, § 2, we began by comparing shared-time services to 1970 PA 100, which we already concluded violated Const 1963, art 8, § 2. We outlined three ways in which these two schemes differed and noted that these were "differences in control":

> First, under [1970 PA 100] the public funds are paid to a private agency whereas under shared time they are paid to a public agency. Second, [1970 PA 100] permitted the private school to choose and to control a lay teacher where as [sic] under shared time the public school district chooses and controls the teacher. Thirdly, [1970 PA 100] permitted the private school to choose the subjects to be taught, so long as they are secular, whereas shared time means the public school system prescribes the public school subjects.

> *These differences in control are legally significant.* [*Traverse City*, 384 Mich at 413-414 (emphasis added).]

In this case, MCL 388.1752b fails this test of control. MCL 388.1752b is identical to 1970 PA 100—the very statute Const 1963, art 8, § 2 was amended to prohibit. Like 1970 PA 100, under MCL 388.1752b, "the public funds are paid to a private agency." *Traverse City*, 384 Mich at 413. Like 1970 PA 100, MCL 388.1752b "permit[s] the private school to choose and to control a lay teacher" or other staff to carry out the reimbursed function.[4] *Id.*

Our discussion of shared-time services provided at a nonpublic school further shows how far MCL 388.1752b falls outside the bounds of Const 1963, art 8, § 2. In *Traverse City*, we were clear that shared time could be provided at a nonpublic school "only under conditions appropriate for a public school," meaning conditions in which "the ultimate and immediate control of the subject matter, the personnel and premises must be under the public school system authorities, and the courses open to all eligible to attend a public school." *Traverse City*, 384 Mich at 415. *Only* under those conditions was this Court willing to say that such a program was permitted. *Id.* at 416. With regard to the prohibition in Const 1963, art 8, § 2 of public funds supporting "the employment of any person at any such nonpublic school," we were clear that "shared time supports the employment *of public school teachers* at the public school were [sic] they draw their check, and that the location where they perform some or all of their services for shorter or longer periods of time may be a nonpublic school under such conditions of control as a public school . . . ." *Id.* (emphasis added). Clearly MCL 388.1752b does not comply with any of this. MCL

---

[4] With MCL 388.1752b, there is no subject matter relevant to the third comparison.

21

388.1752b would convey funds directly to the nonpublic school to pay teachers and other staff under its control. Further, MCL 388.1752b would fund other portions of the overhead of the nonpublic school as identified on Department of Education forms. As already mentioned, nothing in *Traverse City* or this Court's subsequent jurisprudence allows for *direct* financial payments of public money to "aid or maintain" nonpublic schools, and it is misleading to claim that invalidating MCL 388.1752b would require this Court to overrule any of the very specific holdings in *Traverse City*.

The opinion for affirmance turns the alternative construction of *Traverse City* on its head by focusing on the limited discussion regarding auxiliary services, which we explicitly limited to those services at issue in that case. Not only does the opinion for affirmance extend the discussion of auxiliary services beyond the explicit boundaries we set in *Traverse City*, it also exaggerates its import within those boundaries. In reading the opinion for affirmance, one would think that *Traverse City*, in discussing auxiliary services, approved any direct payment to a nonpublic school so long as the payment went toward "general health and welfare measures." That is decidedly not what we said in *Traverse City*. Rather, we discussed services *provided by public schools* and made available to nonpublic-school students:

> In addition auxiliary services are similar to shared time instruction in that *private schools exercise no control over them*. They are *performed by public employees* under the exclusive direction of public authorities and are given to private school children by statutory direction, not by an administrative order from a private school. [*Traverse City*, 384 Mich at 420 (emphasis added).]

Further, we explicitly limited the analysis to "those services enumerated in the Auxiliary Services Act" and cautioned that our analysis of those auxiliary services specifically

22

enumerated by statute "does not give the legislature a blank check to make any service a health and safety measure outside the reach of Proposal C simply by calling it an auxiliary service." *Id.* To the extent that this discussion is relevant to the interplay of Const 1963, art 8, § 2 and MCL 388.1752b, it should raise a cautionary flag to attempts to avoid Const 1963, art 8, § 2 by legislative labeling. Certainly, our discussion of auxiliary services did not state a general rule of how to apply Const 1963, art 8, § 2. Neither did our discussion of auxiliary services set out the alternative construction we applied to avoid conflict with the federal Constitution.

## IV. CONCLUSION

We conclude that MCL 388.1752b violates Const 1963, art 8, § 2 under the common understanding of the constitutional provision. Because there is no conflict between Const 1963, art 8, § 2 and the federal Constitution as applied to MCL 388.1752b, no alternative construction of Const 1963, art 8, § 2 is required. But even if we did apply the alternative construction of *Traverse City* to MCL 388.1752b, its funding would still be prohibited.

Megan K. Cavanagh
Bridget M. McCormack
Richard H. Bernstein

CLEMENT, J., did not participate because of her prior involvement as chief legal counsel for Governor Rick Snyder.